Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

# UNITED STATES DISTRICT COURT
for the

Southern District of New York

Civil Division

| | |
|---|---|
| Ege Kilinc <br> *Plaintiff(s)* <br> (Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.) <br> -v- <br> PMMUE EDUSERVICES PRIVATE LIMITED d/b/a TETR College of Business a/k/a Tetr, New York; UBI Business School; and Viney Sawhney <br> *Defendant(s)* <br> (Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.) | Case No. 25-cv-7931 <br> *(to be filled in by the Clerk's Office)* <br><br> Jury Trial:  *(check one)*   ☒ Yes   ☐ No |

## COMPLAINT FOR A CIVIL CASE

**I.   The Parties to This Complaint**

   **A.   The Plaintiff(s)**

   Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

   | | |
   |---|---|
   | Name | Ege Kilinc |
   | Street Address | 12741 Council Bluff Dr |
   | City and County | Austin, Travis |
   | State and Zip Code | Texas 78727 |
   | Telephone Number | 737-243-5447 |
   | E-mail Address | kilincege@hotmail.com |

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

**B.     The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | PMMUE EDUSERVICES PRIVATE LIMITED |
| Job or Title *(if known)* | |
| Street Address | 401 Park Ave |
| City and County | New York, New York County |
| State and Zip Code | New York 10016 |
| Telephone Number | +1 833 832 9232 |
| E-mail Address *(if known)* | info@tetr.org |

Defendant No. 2

| | |
|---|---|
| Name | UBI Business School |
| Job or Title *(if known)* | |
| Street Address | Rue de Namur 48 |
| City and County | Brussells |
| State and Zip Code | Belgium, 1000 |
| Telephone Number | +32 2 548 04 80 |
| E-mail Address *(if known)* | info@ubi.edu |

Defendant No. 3

| | |
|---|---|
| Name | Viney Shawney |
| Job or Title *(if known)* | Finance Professor, Harvard University |
| Street Address | |
| City and County | Boston |
| State and Zip Code | Massachusetts |
| Telephone Number | |
| E-mail Address *(if known)* | vsawhney@harvard.edu |

Defendant No. 4

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |

E-mail Address *(if known)*

## II.  Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☒ Federal question          ☒ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.  If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

The Americans with Disabilities Act (ADA), 42 U.S.C. § 12181 et seq.

### B.  If the Basis for Jurisdiction Is Diversity of Citizenship

1. The Plaintiff(s)

    a. If the plaintiff is an individual
    
    The plaintiff, *(name)* Ege Kilinc, is a citizen of the State of *(name)* Texas.

    b. If the plaintiff is a corporation
    
    The plaintiff, *(name)* _____, is incorporated under the laws of the State of *(name)* _____, and has its principal place of business in the State of *(name)* _____.

    *(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2. The Defendant(s)

    a. If the defendant is an individual

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

    The defendant, *(name)* _____ , is a citizen of
    the State of *(name)* _____ . Or is a citizen of
    *(foreign nation)* _____ .

  b.  If the defendant is a corporation
    The defendant, *(name)*  TETR College of Business  , is incorporated under
    the laws of the State of *(name)* _____ , and has its
    principal place of business in the State of *(name)* _____ .
    Or is incorporated under the laws of *(foreign nation)*  Haryana, India  ,
    and has its principal place of business in *(name)*  New York  .

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

 3.  The Amount in Controversy

    The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

    Because Plaintiff seeks recovery of paid tuition/fees and housing/travel already incurred (≈ $60,000+), a cancelled five-figure business contract, cancelled attendance at a travel show for his startup, business losses exceeding ($100,000+) and three years of work, consequentional damages in an amount to be determined at trial, to include the lost value and benefit of the $232,500 educational contract, medical/therapy and other out-of-pocket losses, and consequential/punitive damages for bad-faith handling totaling well over $75,000 exclusive of interest and costs.

## III. Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

PRELIMINARY STATEMENT REQUIRING EMERGENCY INTERVENTION

1. The Plaintiff is a U.S. citizen, entrepreneur and a undergraduate business student that is stranded in Singapore after being lured there from his home in Texas by an entity that claims to be New York based and operating out of "401 Park Avenue", he seeks an immediate emergency TRO against this multi-national educational company that is operating across eight different countries including New York [Ex. J-O, Decl. ¶11-20]. While actively operating, Defendant's company registration in Singapore nor New York can be found.

2. The Plaintiff is a vulnerable student with a known disability, completely isolated and abandoned in a foreign country, and has been subject to outrageous conduct over the past three weeks by the Defendant. He seeks an immediate TRO to preserve the status quo and prevent further irreparable harm to his physical health including the severe exacerbation of his disability, and already fragile emotional health, once-in-a-lifetime education in a foreign country, business, financial health and liberty, with a strong anti-retaliation clause to protect the integrity of the court proceedings due to the Defendant's outrageous pre-litigation conduct.

3. Exactly one day after his final notice to file a lawsuit, seek an emergency injunction in this very district and make criminal referrals against the Defendant, the Defendant retaliated. This retaliation was a direct response not only to Plaintiff asserting his legal rights, but also to his protected activities under the ADA, including requesting reasonable accommodations for his disability. The Defendant attempted to use foreign armed police to get him involuntarily committed to a Psych ward and put him in jeopardy of corporal punishment, weaponizing his visa vulnerability that they themselves created by explicitly instructing him to enter Singapore on a tourist visa and later weaponized against him. Plaintiff respectfully requests that the court immediately issue an order, inter alia, to prevent the Defendant from calling foreign law enforcement without a good-faith, objectively reasonable basis [Decl. ¶7, ¶49-50, ¶53, ¶9, Ex. 47-49, 51-52]. While the Plaintiff is not terminated or suspended, this dangerous pattern of quick and forceful deportation aligns with a previously terminated student's experience as outlined in his declaration to prevent legal challenge [Ex. K].

4. Since August 29, 2025, the Plaintiff has been left without access to the student accommodation in a foreign country and has been, de facto suspended from his once-in-a-lifetime educational program in Singapore thereby denying him equal access to his education on the basis of his disability. This occurred after he was given explicit verbal and written promises of safety to protect him from another student and her father so he can participate in the third semester of his program and took a twenty-four-hour flight from Texas to Singapore after missing a week of school, the Defendant renegaded all their promises that was given just a day prior upon his landing and effectively abandoned him at the airport due to absence of promised safety measures [Ex. 24-26].

5. Defendant has given multiple explicit promises to the Plaintiff to immediately provide safe housing, a stipend, and restore his access to in-person education as part of his $232,500 educational contract. These were not merely contractual promises; they were necessary accommodations to prevent the severe exacerbation of his stress-induced disability. Defendant has failed to deliver despite their verbal and written promises, while the Plaintiff has been using his mother's credit card for the past three weeks to avoid homelessness which declined on Sep 21, his fifteenth hotel extension is expiring on Wednesday morning EST, a last resort that is now reaching its absolute financial limit and pushing the Plaintiff towards bankruptcy [Ex. 56], Defendant for almost a month now has been playing a cruel cat-and-mouse game with the Plaintiff, promising accommodation and a stipend and later stonewalling or deflecting when asked to follow through [Ex. 30-32, 41].

6. Furthermore, the Plaintiff suffers from Hidradenitis Suppurativa (HS), a chronic and painful physical impairment that qualifies as a disability under the Americans with Disabilities Act (ADA) and is acutely triggered by severe stress. Defendant's sustained campaign of institutional harassment and abuse over the past two-months directly caused a debilitating flare-up of this disability, and refusal to provide antibiotics for three weeks despite his constant warnings has directly caused Plaintiff an ongoing medical emergency. His repeated requests for this basic medical care constituted requests for a reasonable accommodation for his disability. The Plaintiff intimidated by the cost of healthcare in Singapore was forced to perform multiple counts of self-surgery over the past two weeks with a hotel toothbrush to drain a bleeding, stress-induced cyst and stave off a systemic infection. When the Defendant finally acted, only after the Plaintiff threatened criminal referrals their response was a study in gross negligence. They attempted to "price-shop" for his life, taking him to a chaotic overcrowded hospital where they were advised he needed immediate private care, a recommendation they refused to authorize [Ex. 50-52]. This refusal was a discriminatory denial of a reasonable accommodation. As a direct result of their continued indifference, the Plaintiff as of the morning of Sep 22, almost a month after his first request for antibiotics has a fever that he is having an extremely hard time controlling, and a reasonable fear of sepsis, constituting an ongoing and severe irreparable harm that demands this Court's immediate intervention

to comply the Defendant to authorize his medical care at the recommended hospital. Plaintiff suspects a possible deep tissue infection which he does not possess the medical equipment or expertise to operate, he is currently self-administering 1000mg of Paracetamol every 8 hours and 220mg of Naproxen Sodium every 12 hours [Ex. 44 (Graphic), 57]. Although he has managed to temporarily control the fever, he urgently needs a professional medical evaluation and immediate antibiotic treatment to prevent his condition from getting worse.

7. Due to the extreme emotional stress of complete abandonment and total isolation in a foreign country for over three weeks now, risk of homelessness, and denial of his once-in-a-lifetime education in a foreign country for which he paid $19,050 in tuition fees this semester [Ex. 58], the extreme emotional stress caused by the Defendant's misconduct is actively causing further deterioration of his physical health via severe and ongoing symptoms of his disability, mainly the formation of multiple new inflamed stress-induced cysts he discovered on September 22 in addition to the existing one that was formed a month ago that actively bleeds. This physical deterioration is a direct and foreseeable result of the emotional stress the Defendant's misconduct has caused and which they were on notice for since mid-August [Ex. Disability]. This hostile and discriminatory environment denies him equal access to his education and actively harms his health, and Plaintiff needs an emergency intervention to prevent further irreparable harm and stabilize his health.

8. Furthermore, the Defendant's two-month-long campaign of misconduct has caused severe emotional and mental harm as evident by the severe psychosomatic symptoms the Plaintiff is experiencing and has critically resulted in the Plaintiff's inability to work, his current indigence status and the total collapse of his U.S. based travel-technology startup where he had to let go of his team due to defendant's conduct that has caused severe emotional harm, an enterprise into which he had personally invested three years of labor while attending school and over six-figures in capital (proved by receipts). This collapse is a direct consequence of Defendant's discriminatory failure to accommodate his disability, which left him physically and mentally unable to manage his enterprise. He needs an immediate intervention to restore his health and the status quo to prevent further emotional harm so he can immediately try to save his company.

9. Plaintiff has completely exhausted all remedies despite risking his own health, education, business, finances and liberty trying to resolve the situation internally for over two months now, and respectfully requests immediate intervention to preserve the status quo to prevent further irreparable harm as outlined herein and in his sworn declaration that is supported by over 50 exhibits and complete metadata supporting the allegations. The plaintiff respectfully requests that the court order the Defendant to only comply with the promises they have made but failed to deliver and their contractual obligations, and their duties under federal law to provide reasonable accommodations for his disability so he can immediately stabilize his life. The Defendant's has been on notice of litigation and specifically the Plaintiff's intention of seeking emergency intervention in SDNY since mid-August, they have taken advantage of this time to alter their website in an attempt to hide their jurisdictional ties while stalling the Plaintiff with constant made-and-broken promises to prevent litigation causing only further harm to Plaintiff [Ex. H].

THE PARTIES

10. Plaintiff EGE KILINC is a United States Citizen and a resident of the State of Texas. He is a sophomore undergraduate student enrolled in the Defendant's business program.

11. Defendant PMMUE EDUSERVICES PRIVATE LIMITED d/b/a TETR College of Business a/k/a Tetr, New York, is a foreign private limited company whose registration cannot be found in the state of New York, and instead appears to be incorporated under the laws of Haryana, India, while claiming to be operating out of "401 Park Ave, New York". The Defendant operates an international undergraduate business program that spans across eight different countries, including the United States and Singapore.

12. Defendant UBI Business School ("UBI") is a private educational institution with its principal place of business in Brussels, Belgium. UBI partnered with Defendant TETR College of Business to confer academic degrees on students enrolled in Tetr's international program, while conducting Zoom meetings to support Tetr in convincing prospective students to enroll. UBI served as an essential component of the fraudulent enterprise, lending its European academic accreditation to a scheme it knew was being deceptively marketed to U.S. and international students as "Tetr, New York." UBI knowingly allowed its name and degrees to be used as the ultimate prize in an enterprise that funneled U.S. student tuition payments through New York. Furthermore, UBI actively assisted "Tetr, New York" with their fraudulent scheme by creating and providing Plaintiff with a pretextual travel itinerary, a document intentionally designed to conceal his status as a student and misrepresent him as a tourist to Singaporean immigration authorities which the Defendant later weaponized against him.

13. Defendant Viney Sawhney is an individual and, upon information and belief, a resident of the Commonwealth of Massachusetts. Mr. Sawhney is a Professor at Harvard Business School. Mr. Sawhney served as a key U.S.-based agent, advisor, and recruiter for TETR College of Business. He lent his significant personal and professional credibility, as well as the implicit endorsement of Harvard University, to the scheme by leading recruitment events for Tetr at the Harvard Club, Harvard College, and Harvard Business School, which the Plaintiff had participated in before enrolling. His participation was essential to the fraudulent inducement of U.S. and North American students, as he served as the primary, high-prestige American contact that gave the enterprise a veneer of legitimacy it otherwise lacked [Ex. C].

JURISDICTION AND VENUE

14. This Court has personal jurisdiction over Defendant Tetr. While the official company registration can't be found in the New York State database, Tetr purposefully availed itself of this forum through a systematic and fraudulent campaign to project a New York identity to thousands of U.S. and international students, and used this identity to enroll approximately 300 students into its program. This projection includes: (a) adopting the brand "Tetr, New York"; (b) holding recruitment events at the Harvard Club, Harvard College and Harvard Business School with Harvard Faculty; (c) sending official offer letters via wires and physical mail to more than 300 U.S. and international students bearing a 401 Park Ave, New York address [Ex. A-B]; (d) collecting millions of dollars of student tuition while projecting a 401 Park Ave, New York address in the footer of their official correspondence and payment emails via direct hyperlinks [Ex. G]; (e) directing all U.S. tuition payments into the U.S. stream of commerce via a bank account located in this District at 810 Seventh Avenue [Ex. I]; and (f) induced and targeted U.S. and international students to commit funds and travel across state and international borders using these material representations.

15. Jurisdiction Under the "Public Accommodation" Doctrine. Independently, this Court has personal jurisdiction over Defendant because its international educational program operates as the functional equivalent of a foreign-flagged cruise ship, a model the Supreme Court has already found to be subject to U.S. law. As established in Spector v. Norwegian Cruise Line Ltd., Defendant is a "public accommodation" subject to the ADA because: (a) It Operates Within U.S. Territory. Defendant is not merely analogous to an entity operating in the U.S., its own curriculum mandates that its international program physically operates in New York for an entire semester. Furthermore, the Defendant purposefully availed itself of the U.S. market by conducting a sophisticated marketing campaign from a New York nexus, using a New York address on its contracts, and collecting millions in tuition from U.S. citizens through a New York bank account. Like a cruise ship that repeatedly docks at a U.S. port to sell tickets to Americans, Defendant "docked" its business in New York to sell its educational services, with the explicit promise of returning to that very port as a core part of its educational product; (b) The Service is Rendered from the U.S. The entire transaction, from recruitment to the offer letter to the payment of tuition originated from Defendant's fraudulent U.S. identity. The educational "voyage" began, in a contractual and financial sense, in the United States. Defendant cannot sell a U.S. product in the U.S. and then claim immunity from U.S. civil rights law the moment its customer leaves the shore; (c) The Harm is a Continuation of U.S.-Based Discrimination. The denial of reasonable accommodation in Singapore is not a separate, foreign tort; it is the foreseeable and direct culmination of a discriminatory relationship that began and was cemented in the United States. To allow Defendant to escape the reach of the ADA would be to grant corporations a license to discriminate against disabled American citizens, so long as the final act of harm is strategically executed on foreign soil.

16. Consciousness of Guilt: Spoliation of Jurisdictional Evidence. Defendant is fully aware that its New York contacts are sufficient for jurisdiction. Immediately after Plaintiff served a legally binding preservation notice and stated his final intent to sue in SDNY in writing, Tetr was caught altering its website to conceal its New York address, making a single change in the entire website by adding the vague "U.S. Shipping Address" on top of their "401 Park Ave, New York" address [Ex. H]. This act of spoliation constitutes a direct admission of the Defendant's awareness of its jurisdictional exposure and was a bad-faith attempt to defraud this Court.

17. This filing is supported by sworn declarations from other international and U.S. students and their parents who are actively enrolled in the program. These declarations corroborate a consistent pattern of fraudulent inducement and establish Defendant's purposeful availment of the New York forum [Ex. J-O]. Specifically, the students declare under penalty of perjury that: (a) Defendant's "Tetr, New York" branding was the primary and fraudulent basis for their decision to enroll in what they were led to believe was a New York-based institution; (b) They were recruited through events at the Harvard Club, where Defendant's U.S.-based agent, Viney

Sawhney, was used to create a veneer of Harvard prestige and a New York-based institution; (c) Defendant employed a uniform "bait-and-switch" scheme, securing their non-refundable deposits and waiting after they withdraw and reject their other university offers before revealing a contract that stripped them of their U.S. legal protections and forced them into an inadequate Indian forum in which one student states in his sworn declaration under penalty of perjury that he attempted to seek legal remedies in India but his foreign lawyers explicitly stated that Tetr was above law due to their political connections [Ex. K]; (d) Collectively, these declarations demonstrate that Plaintiff was not an isolated case, but one of many students targeted by a systematic, fraudulent scheme centered on New York.

18. Jurisdiction is proper under the "Effects Test" as Defendants' intentional, tortious actions were expressly aimed at the Plaintiff in the United States while his primary point of contact, Director of Student Experiences J.V., was also in the United States, causing the brunt of the initial harm here that started on July 18th.

18.1. The Locus of the Tort Was the United States. Defendants' possible argument that this is a "Singaporean dispute" would be a deliberate mischaracterization of the facts. The central torts of fraudulent inducement, reckless disregard, and breach of contract, inter alia, occurred and were completed while the Plaintiff was physically present in the United States and while his primary point of contact, Director of Student Experiences J.V., was also in the United States. The financial injury was inflicted upon his U.S. assets. The severe emotional distress from Defendants' escalating misconduct began over the summer break and was suffered in Texas and Nevada while the Program Manager was in Dubai and India, and the Director of Student Experiences was in the United States and India.

18.2. The Harms in Singapore Are the Foreseeable Consequences, Not the Jurisdictional Hook. The subsequent events in Singapore are not a new and distinct jurisdictional case; they are the predictable and devastating damages that arose from the U.S.-based causes of action. There is a direct and unbroken chain of causation, as demonstrated by over 50 exhibits collected over a two-month period that began on July 18. The Defendants' initial breach of contract, fraudulent inducement, and scheme were directed at the Plaintiff while he was in the United States; he would never have been in Singapore requesting emergency intervention if he had not been abandoned, denied his right to education, medically endangered, and subjected to retaliatory police action after being lured there with false promises. Defendants' liability does not vanish by luring their victim across a border. For this Court to decline jurisdiction would be to create a perverse incentive for foreign actors to target vulnerable U.S. citizens and students with fraudulent schemes, knowing they could escape accountability so long as the final, most calamitous harm was engineered to occur on foreign soil.

19. Defendants' Scheme Was Predicated on Creating the Fraudulent Illusion That They Were a New York Institution Subject to General Jurisdiction. Beyond the specific contacts that independently establish jurisdiction, the Court must consider the fundamental nature of the Defendants' misrepresentations. The fraudulent scheme was not merely to transact business through New York, but to project the false identity of a New York-based institution. By adopting the brand "Tetr, New York" and using a New York address on official documents, Defendants were purposefully cultivating the appearance of being "at home" in this forum. This was a calculated effort to cloak a foreign enterprise with the prestige, stability, and crucially the legal accountability of a New York entity. The implicit promise of such branding is that the entity is subject to the jurisdiction of New York's courts, the very hallmark of general personal jurisdiction. Plaintiff's reliance on this manufactured identity was both reasonable and the direct target of Defendants' scheme. It would be a profound injustice to allow Defendants to now benefit from their own deception by arguing that the New York identity they so carefully crafted has no jurisdictional consequence.

20. New York is the only appropriate and stable forum because the defendants' roving international model is designed to render them immune from suit in any other jurisdiction. Defendants may contend that this matter should be dismissed under the doctrine of forum non conveniens, suggesting that Singapore is a more appropriate venue despite the unbroken chain of causation. This argument is untenable and overlooks the fundamental nature of the Defendants' business model, which is designed to render them perpetually transient and unaccountable. The Tetr program operates across eight different countries, with students and staff moving locations every few months. The current and latest location of the Plaintiff's harm, Singapore, is merely a temporary stop. In a matter of weeks, the program and its key personnel will relocate to Malaysia, then to Ghana, followed by New York, and subsequently to other locations. This creates an impossible and unjust "whack-a-mole" scenario for the Plaintiff, who cannot be expected to chase the Defendants around the globe, hiring new counsel and restarting litigation in a new country every semester. This transient operational model makes it clear that the only logical, stable, and fair forum for this dispute is the one that formed the basis of the

parties' relationship: New York. The fraudulent inducement occurred through the "Tetr, New York" brand, the contractual relationship was cemented with an offer letter bearing a New York address, and the financial injury was directed through a New York bank. This forum serves as the anchor and the locus of the tort. Allowing Defendants to use their international mobility as a shield against the very jurisdiction they fraudulently claimed would offend traditional notions of "fair play and substantial justice". Public policy strongly favors exercising jurisdiction here, to prevent entities from exploiting a New York identity for financial gain and then utilizing their transnational character to evade the reach of U.S. law.

21. Jurisdiction Under the "Effects Test" for Intentional Torts. In addition, this Court has personal jurisdiction over Defendants for their tortious conduct because their actions, though committed abroad, were expressly aimed at New York. Specifically, the defendants' most outrageous act, summoning the Singaporean police to have the Plaintiff involuntarily committed, was an intentional tort committed for the specific purpose of preventing him from filing this very lawsuit in this very District, a fact he had repeatedly communicated to them in writing. The "brunt" of the harm from this act of witness intimidation and obstruction of justice was therefore intended to be felt, and was felt, in New York. Accordingly, Defendants have purposefully availed themselves of this forum by targeting and attempting to manipulate its judicial process [Ex. 47-48].

22. The Defendant's Program Manager, Tarun Gangwar, himself suggested in their in-person meeting in Singapore on September 5th that started at 9:00am [Ex. 38], the Plaintiff can sue them in New York, against the lawyers of the extremely wealthy founder and "waste the best years of his life" while explicitly implying that they are ready and the founder himself has sufficient connections and stating, "he even lived in the U.S. for 10 years and filed taxes," therefore consenting to the jurisdiction of this forum.

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claim occurred here, including the systematic and deceptive use of a New York address and bank account to create the false impression of a New York institution to over 300 U.S. and international students to induce tuition payments.

DISABILITY

24. Plaintiff suffers from Hidradenitis Suppurativa (HS), a chronic and painful inflammatory condition that qualifies as a disability under the Americans with Disabilities Act (ADA) [Decl. ¶8].

25. HS is a physical impairment that substantially limits one or more major life activities and major bodily functions.

26. Defendant was aware of Plaintiff's disability since Aug 15 and was constantly warned that his health was deteriorating due to their conduct [Ex. Disability].

27. It is well-documented that severe emotional and physical stress is a primary trigger for HS flare-ups.

28. Defendant's campaign of bad faith, broken promises, and institutional harassment directly caused the Plaintiff to suffer a severe and debilitating flare-up of his disability, resulting in inflamed and bleeding cysts.

29. Faced with a debilitating flare-up of his disability directly triggered by Defendant's misconduct Plaintiff made a direct and multi-faceted request for reasonable accommodations necessary to manage his condition and access his education. This request included: (a) Medical Accommodation: Immediate medical assistance and antibiotics to treat the acute physical symptoms of his disability flare-up; (b) Housing Accommodation: The provision of the promised safe and stable hotel accommodation to mitigate the primary stressor of imminent homelessness, which was actively and foreseeably exacerbating his medical condition; (c) Educational Accommodation: A clear and safe path to resume his in-person education, as the stress and isolation from being de facto suspended was another key trigger for his disability.

30. Defendant discriminatorily denied every component of this request for reasonable accommodation. Instead of providing medical care, they "price-shopped" for his life; instead of providing the promised hotel, they engaged in a cruel cat-and-mouse game of broken promises; and instead of providing safe educational access, they offered a punitive regimen of isolation suggesting him to "arrange meals separately" and join classes "virtually from a designated classroom". This comprehensive failure to accommodate his disability denied him equal access to the educational program in clear violation of the ADA.

PRETEXT

31. This crisis began with a pretext. After Plaintiff respectfully requested repayment of a ~$4,000 debt from a fellow student, his ex-girlfriend S.K., her family retaliated, and her father made physical threats that he later deleted on WhatsApp [Ex. 1-2]. Three days later, S.K.'s aunt, acting as her legal counsel, obtained a fraudulent

ex parte protective order against the Plaintiff in a small Turkish town under Turkish Law 6284 (no evidence required), knowingly using a fictitious address and fabricating an "immediate physical danger" while Plaintiff was in Texas for a month as a U.S. citizen with no ties to Turkey except summer visits [Ex. 4-9].

32. This fraudulently obtained document was later shared with the Defendant during the summer break in an attempt to remove him from school, while the Plaintiff remained unaware of its existence due to service fraud and a lack of court jurisdiction.

STATEMENT OF FACTS

BACKGROUND

33. Instead of exercising any due diligence, Defendant Tetr's response was a study in bad faith and surreal incompetence. They accepted the unauthenticated Turkish order as a PDF via WhatsApp and admitted to Plaintiff that they used ChatGPT for the translation. The Director of Student Experiences confessed to an internal gender bias in the compliance team, explicitly stating that the "optics didn't look good" because the complainant was female, while simultaneously admitting to Plaintiff that "I know you're not that type of person... you deserve better than her...you should not let her use your Spotify account" [Decl. ¶26-¶27, ¶29, Ex. 12]. When confronted about the Plaintiff's innocence and the other student's misconduct, her immediate attempt to move the conversation off the written record "We need to talk on call and not on text" serves as a de facto confession of the institution's consciousness of guilt, proving their position was indefensible in writing [Ex. 14].

34. This was the beginning of a month-long campaign of obstruction. Despite receiving over thirty emails, sixty-seven-pages of statements and evidence, and exchanging hundreds of WhatsApp messages with the Plaintiff, Tetr conducted a secret investigation while refusing to share the allegations against him. They absurdly cited European data law (GDPR) as a pretext to deny him access to his own disciplinary file, a violation of his most basic due process rights [Decl. ¶29, ¶31, Ex. 15-16].

35. The Defendant over this month-long secret investigation was also on explicit notice that they were actively obstructing the Plaintiff's ability to dismiss the fraudulent order by proving its misuse, defending himself against a criminal prosecution in Turkey, and seeking a remedy from the Department of State and the Turkish Constitutional Court, facts he repeatedly warned them of in writing [Decl. ¶28, Ex. 13-14, 16].

36. Ultimately, when Plaintiff and his Turkish Counsel provided irrefutable proof of evidence tampering in the document and explicitly stated that the Defendant could verify it "in 2 minutes", Defendant decided to double down and refuse evidence tampering in writing while condescendingly instructing him to "trust the process" and deliberately attempted to make him question his reality by stating "it's messing with you for no reason" [Ex. 19, 21].

FRAUDULENT INDUCEMENT TO SINGAPORE

37. On August 27, 2025, to stop Plaintiff from seeking legal relief so he can immediately continue his education as part of the $232,500 contract that they have signed and to cover their prior misconduct, Defendants' Program Manager fraudulently induced him to travel to Singapore. In their meeting, with Plaintiff's mother present as a witness for parts of the conversation, the Program Manager made specific, enforceable promises of strong action and a safe educational environment, explicitly acknowledging Plaintiff's safety requirement of "no same building/no line of sight" [Decl. ¶33, Ex. 24-25]. Relying on these promises, Plaintiff boarded a 24-hour international flight within hours.

38. While Plaintiff was in transit and powerless to turn back, Defendants repudiated their entire agreement. Hours before his landing, they sent an email walking back on all their promises and assurances from the previous day's meeting, replacing all the promised safety measures and strong disciplinary action to protect him against the other student with a set of known previously admitted inadequate measures they claimed now "should suffice", a classic bait-and-switch timed for maximum cruelty [Decl. ¶34, Ex. 26]. In the same email, the Defendants also acknowledged the other student's misconduct by stating the institution expects "dignity and decorum" while attempting to repackage pre-existing policies, such as gender segregation in the accommodation, as a special safety measure for him.

THE ABANDONMENT AND HUMANITARIAN CRISIS

39. Upon landing, this repudiation became a humanitarian crisis. The plaintiff, as an undergraduate business student, was practically abandoned at the airport, as he couldn't go to the student accommodation in the absence

of the previously discussed safety measures. His designated POC, who had been assigned to him as part of the newly proposed inadequate safety measures, wasn't even briefed about the problem or any safety measure and told the Plaintiff over the phone that he had "no context" for his situation and had "just woke up" and instructed him to come directly to the student accommodation [Decl. ¶35-36, Ex. 27].

40. As Plaintiff had nowhere to go, he sent a photographic plea for help to the Program Manager, only to get a tone-deaf text message: "Hope you had a safe flight" [Decl. ¶37, Ex. W28], while telling Plaintiff to attend "remotely till you feel comfortable", implying his knowledge of the unsafe environment and his broken promises and suggesting a constructive suspension in direct violation of their contract. When the Plaintiff responds within minutes, while he is stranded at the airport, and asks about the safety measures they discussed the previous day, the Program Manager goes silent and doesn't respond back to him.

41. After a total of eight hours in in-person meetings across two sessions, the Program Manager again makes promises that include personal transportation to school, safe accommodation, and even putting the other student in a remote plan if there is any overlap to protect the Plaintiff. He promises and requests a day to discuss everything with the team and come up with a plan to immediately restore his full access to in-person education [Decl. ¶39-43].

42. Specific verbal promises were also again made in these meetings, followed by written confirmation to provide a hotel and a 2,000 SGD stipend, which were also never followed through, leaving Plaintiff stranded [Decl. ¶39, Ex. 41].

43. In a stunning display of malice, in their latest in-person meeting Program Manager also confesses to a coordinated campaign of intimidation and obstruction. He gives the Plaintiff an ultimatum: to obtain the simple PDF he needed to defend his liberty in a foreign criminal trial, he must take the institution to U.S. federal court. Contradicting himself, the Program Manager then threatens the student with a protracted war against the wealthy founder's lawyers, whose father is a powerful political figure, and explicitly states that he would ''waste the best years of his life" attempting to weaponize the U.S. judiciary as a tool of extortion. Then he states that the founder ordered a retaliation, masked as a school investigation and asks the Plaintiff if he is sure that he doesn't have any bad messages from his previous relationship that could be used as a pretext to expel him, this conspiracy was confirmed hours later when the Program Manager sent a written text message confessing that he had spent the last few hours "pulling off something really hard " [Ex. 40]. In the same meeting, the Program Manager, contradicting every threat he made, also attempted to emotionally manipulate the isolated Plaintiff by asking, "If you sue us, what would your friends think about you, what would the Professors you love think about you, including Dr. G. C.?" [Decl. ¶46-48].

44. After these extensive meetings, new explicit promises were made, the Defendant comes up with a new official "safety plan" which barred the Plaintiff from student elections, the networking events, forces him to eat his meals in isolation, suggests he joins classes virtually in the school building and includes a direct liability waiver where the institution states that as part of their safety plan "does not and cannot guarantee" his safety and there are no enforcement mechanisms [Decl. ¶41-42, Ex. 41, 43].

45. Ultimately, after admitting the severe safety risks and acknowledging the other student's misconduct in writing and framing it as a violation of the expectation of "dignity and decorum", the Defendant this time promises to assign walkie-talkies to multiple staff members in writing for his protection, only to later break their promises again and once again admit that their plan has no enforcement mechanisms [Decl. ¶43, Ex. 42].

46. As a direct result of this sustained neglect, which the Plaintiff described to the Program Manager as a "psychological torture house" in a text message, Plaintiffs documented stress-induced psychosomatic medical condition escalated to the point where he was forced to perform self-surgery with a hotel toothbrush to drain a stress-induced cyst multiple times to prevent a systemic infection [Decl. ¶38, Ex. 44 (Graphic)].

The Climax of Malice and Retaliation

47. Finally, the Defendant's abuse reaches its apex with the police incident on September 9. One day after the Plaintiff states to the Program Manager and hic POC that he doesn't think they are going to be able to solve the problem internally because they are not keeping any of the promises they make, the Defendant's Program Manager first messages the Plaintiff and says he lied to them and doesn't really "love" them, than when the Plaintiff rebuts his manipulative self-serving message he goes silent and explicitly one day after, they retaliate against the Plaintiff for his intent to sue and report them to his government for the federal crimes they committed by summoning three armed Singaporean police officers to his hotel room to have him involuntarily committed and get him deported and put him in jeopardy of corporal punishment to prevent him from making this federal

filing on the false pretext of a psychiatric crisis. An act so transparently fraudulent that, after one of the Singaporean police officers read the draft of this federal court filing, he actively assisted the Plaintiff by creating a Singapore Government account for him on the spot and emailing him the official incident number specifically stating that he can "share it with the court" [Decl ¶49-50, Ex. 46-48, 50].

CAUSES OF ACTION

COUNT I: FRAUDULENT INDUCEMENT
48. Defendant engaged in a systematic scheme to fraudulently induce more than 300 U.S. and international students, including Plaintiff, to enroll by making material misrepresentations about its U.S. presence, including its "Tetr, New York" branding, use of a New York bank, and offer letters with New York addresses, all while concealing its foreign legal identity and an onerous foreign forum clause until after non-refundable deposits were paid and student's including the Plaintiff rejected and withdrew all their other university applications. Plaintiff solely relied on these misrepresentations to his detriment in choosing an educational institution that he would attend for the next four years.
49. After its compliance team admitted to safety risks from another student, Defendant's leadership fraudulently induced Plaintiff to travel to Singapore from Texas. The Program Manager made clear promises of "strong action" to protect him to both the Plaintiff himself and his mother, and recognized Plaintiffs required safety standard of "no same building/no line of sight" pending the outcome of their final investigation. Relying on these promises, the Plaintiff immediately booked a 24-hour international flight, only for the Defendant to repudiate every assurance upon his arrival, resulting in immediate de facto suspension, denial of education, and homelessness, as the Plaintiff could not enter student accommodations or the campus without the promised safety measures in place.

COUNT II: BREACH OF CONTRACT
50. Defendant breached its binding contract with Plaintiff by, inter alia, failing to provide a safe learning environment as part of their contract, failing to follow a fair disciplinary process, and constructively suspending the Plaintiff by admitting the campus was unsafe for in-person attendance and officially suggesting that he "arrange meals separately" while barring him from student elections and other events in direct violation of their contract.

COUNT III: BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
51. Defendant breached the implied covenant of good faith trough a sustained campaign of malicious and dishonest conduct, including stonewalling, retaliation, and deception, designed to deprive Plaintiff of the benefits of his contract and engaging in emotional blackmail by threatening Plaintiff with social and academic ostracization in a bad-faith attempt to intimidate him into abandoning his legal rights.

COUNT IV: PROMISSORY ESTOPPEL
52. In the alternative, Defendant is liable under Promissory Estoppel for making a clear and unambiguous promise of safety on August 27, which it knew would induce Plaintiff to travel to Singapore, and upon which Plaintiff reasonably relied to his catastrophic detriment.
53. Furthermore, after Plaintiffs arrival in Singapore, Defendant made a series of new, clear promises, both written and verbal, including providing a 2,000 SGD stipend, guaranteed hotel accommodation, transportation to school, and enforced measures for safety. Plaintiff reasonably relied on these subsequent promises by remaining in Singapore under dangerous and stressful conditions. Defendant's ultimate failure to honor any of these commitments left Plaintiff stranded and financially destitute, and injustice can only be avoided by enforcing these promises.
54. Defendants made multiple written and verbal statements that they were GDPR compliant, while using it as a pretext to deny Plaintiff access to his own disciplinary file despite formal GDPR requests, a direct violation of his Article 15 right to access, Article 17 erasure request for weeks, and the continuation of processing sensitive data obtained through illicit means and translated with insecure tools like ChatGPT are gross violations of Article 5 and 6.

COUNT V: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

55. Defendant's conduct was so extreme and outrageous as to be beyond all possible bounds of decency, and included, inter alia: (a) abandoning a student at a foreign airport after promising strong action; (b) mocking his crisis with the "chicken rice" text; (c) summoning foreign police to his bed while he was sleeping to have him institutionalized; (d) summoning armed police in an attempt to prevent him from seeking legal remedies; (e) creating and later exploiting his visa vulnerability in a country where violations are punished by corporal punishment; and (f) threatening to turn Plaintiffs peers and beloved professors against him, thereby weaponizing his personal and academic relationships in an act of extreme psychological coercion.

COUNT VI: GROSS NEGLIGENCE
56. Defendant demonstrated a conscious and reckless disregard for Plaintiff's safety and well-being, constituting gross negligence.

COUNT VII: DEFAMATION, SLANDER PER SE & LIBEL PER SE
57. Defendant, with actual malice, knowingly published a false and defamatory statement to the Singaporean Police Force that Plaintiff was experiencing a psychiatric crisis to prevent a civil lawsuit, a statement that is defamatory per se as it falsely imputes a loathsome mental state and was calculated to deprive him of his liberty.
58. Defendant, acting with actual malice through its Program Manager, published a libelous written statement accusing Plaintiff of seeking "revenge" and lying about loving the school. These accusations are defamatory and libelous per se, and a malicious fabrication, directly contradicted by the entire evidentiary record that has accumulated over the past two months. The timing and the Program Manager's non-response to the student's rebuttal prove its corrupt purpose: it was manufactured as a last-ditch attempt to rewrite the narrative in direct retaliation to Plaintiff's final threat of litigation.

COUNT VIII: VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12181 et seq.)
59. Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein. In supplement and in the alternative to the claims above, Defendant is liable for discriminating against Plaintiff on the basis of his disability in violation of the Americans with Disabilities Act (ADA).
60. At all relevant times, Defendant, as a private undergraduate educational institution, was a "public accommodation" subject to Title III of the ADA. Plaintiff is a qualified individual with a disability, as he suffers from Hidradenitis Suppurativa (HS), a chronic and painful physical impairment that substantially limits major life activities and bodily functions. Defendant was on direct, written notice of Plaintiff's disability and its acute sensitivity to severe stress.
61. Defendant's sustained campaign of bad faith, fraudulent inducement, and institutional abuse, as detailed supra, was a direct and foreseeable trigger that caused a severe and debilitating flare-up of Plaintiff's disability. Having caused this medical crisis, Defendant then engaged in a pattern of unlawful discrimination by denying Plaintiff multiple, necessary, and reasonable accommodations: (a) Denial of Medical Accommodation: Defendant willfully ignored Plaintiff's repeated and urgent requests for antibiotics and proper medical care. When Defendant finally acted, it denied him a reasonable accommodation by refusing to authorize treatment at the recommended hospital, instead attempting to "price-shop" for his life in an act of deliberate indifference to his suffering; (b) Denial of Housing and Educational Accommodation: Defendant's failure to provide the promised safe housing and its decision to constructively suspend Plaintiff were not merely breaches of contract; they were a discriminatory denial of accommodation. These actions served as primary stressors that foreseeably exacerbated his physical disability while simultaneously denying him equal access to the educational program for which he had paid.
62. Furthermore, Defendant engaged in illegal retaliation and discrimination after Plaintiff engaged in protected activities by requesting these accommodations. Instead of providing a path for his safe return to school, Defendant responded with a punitive and segregated plan that required him to "arrange meals separately", barred him from key educational and networking events, and isolated him from his peers. This was not a good-faith accommodation but an adverse action designed to punish a student with a disability for asserting his rights.
63. As a direct and proximate result of Defendant's discriminatory conduct, its failure to provide reasonable accommodations, and its retaliatory actions, Plaintiff has been denied the full and equal enjoyment of the goods, services, facilities, and privileges of Defendant's public accommodation, in clear violation of the ADA.

COUNT IX: DECEPTIVE ACTS AND PRACTICES (N.Y. GEN. BUS. LAW § 349)

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

64. Defendant engaged in a pattern of deceptive, consumer-oriented conduct to deprive U.S. and international students including the residents of the State of New York of their right to seek appropriate legal remedies in New York with materially misleading facts, causing Plaintiff injury.

**IV.     Relief**

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

A. For Immediate Injunctive and Long-Term Equitable Relief:
1. A Temporary Restraining Order and Preliminary Injunction compelling Defendants to:
(a) Immediately facilitate and bear the full cost of Plaintiff's emergency medical evaluation and all subsequent prescribed treatment at a competent private hospital in Singapore;
(b) Immediately provide and pre-pay for safe, secure housing for the Plaintiff for the pendency of these proceedings as promised in writing;
(c) Immediately cease their unlawful constructive suspension and reinstate Plaintiff's full, equal, and safe in-person access to his educational program, pursuant to an enforceable safety protocol;
(d) Immediately produce the exculpatory evidence required for Plaintiff's defense against the foreign criminal prosecution;
(e) Immediately cease and desist from all retaliatory actions, including a specific prohibition on contacting foreign law enforcement regarding the Plaintiff absent a good-faith, objectively reasonable, and contemporaneously documented emergency.
2. A Permanent Injunction prohibiting Defendants from engaging in the unlawful practices described herein, including fraudulent inducement, breach of contract, and retaliation.
3. A Declaratory Judgment that Defendants' actions constituted fraudulent inducement, a breach of contract, a breach of the covenant of good faith and fair dealing, gross negligence, and intentional infliction of emotional distress.
B. For Compensatory Damages:
1. Economic Damages in an amount to be proven at trial, including but not limited to:
(a) Full restitution and disgorgement of the entire $232,500 value of the educational contract which Plaintiff was fraudulently induced to enter;
(b) Damages for the total collapse and destruction of his U.S.-based, six-figure startup venture, including lost investments, contracts, and future earnings;
(c) All legal fees incurred in both the United States and Turkey to defend against the fraudulent legal actions and to prosecute this matter;
(d) All past, present, and future medical, therapeutic, and pharmaceutical expenses required to treat the severe physical and psychological trauma inflicted by Defendants' conduct.
2. Non-Economic Damages in an amount to be determined by a jury for the severe emotional distress, pain and suffering, reputational harm, and loss of enjoyment of life, including the trauma of a retaliatory police raid, the horror of being abandoned in a foreign country, and the profound grief from his inability to open the shipping box containing his deceased dog's ashes.
C. For Punitive and Exemplary Damages:
1. Punitive and Exemplary Damages in an amount sufficient to punish Defendants for their reprehensible conduct and to deter them and other predatory institutions from engaging in similar acts in the future. Such damages are warranted by a clear and convincing record of Defendants' willful, malicious, and fraudulent acts, which include, but are not limited to:
(a) Perpetrating a systematic, foundational fraud to lure U.S. students under false pretenses only to strip them of their legal protections upon payment of non-refundable deposits and tuition fees;
(b) The Dean's written confession to a retaliatory conspiracy ordered by the Founder;
(c) The malicious, retaliatory summoning of a foreign police force to have a U.S. citizen institutionalized to prevent a lawsuit and put him in jeoporday of deportation and corporal punishment after instructing him to violate a countries immigration laws;
(d) The willful indifference to a life-threatening medical crisis, including the infamous "chicken rice" text, the cruel cat-and-mouse game with constant made-and-broken promises and the attempt to "price-shop" for Plaintiff's life; and
(e) The brazen weaponization of the U.S. judiciary as a tool of obstruction.
D. For Pre-judgment and Post-judgment Interest at the maximum rate permitted by law.
E. For the Costs of this action and, should counsel be appointed, reasonable attorneys' fees.
F. For Such Other and Further Relief as the Court deems just and proper.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

## V. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: _____

Signature of Plaintiff _____
Printed Name of Plaintiff _____

### B. For Attorneys

Date of signing: _____

Signature of Attorney _____
Printed Name of Attorney _____
Bar Number _____
Name of Law Firm _____
Street Address _____
State and Zip Code _____
Telephone Number _____
E-mail Address _____

## V. PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| September 17th, 2025 | *[signature]* |
|---|---|
| Dated | Plaintiff's Signature |

| Ege | | Kilinc |
|---|---|---|
| First Name | Middle Initial | Last Name |

12741 Council Bluff Dr
Street Address

| Travis, Austin | Texas | 78727 |
|---|---|---|
| County, City | State | Zip Code |

| 737-243-5447 | kilincege@hotmail.com |
|---|---|
| Telephone Number | Email Address (if available) |

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:
● Yes    ☐ No

> If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.