UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                      :

EGE KILINC

                                        :       <u>REPORT & RECOMMENDATION</u>

             Plaintiff,           :

                                          :       25 Civ. 7931 (AT) (GWG)

                                        :

      -v.-

                                        :

PMMUE EDUSERVICES PRIVATE LIMITED  :
et al.,

                                        :

            Defendants.      :
------------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

At the time he filed this action, plaintiff Ege Kilinc had been an undergraduate student at Tetr College of Business ("Tetr") since 2024.  His complaint names PMMUE Eduservices Private Limited (the entity that operates Tetr), UBI Business School, and Vivek Sawhney as defendants.  The complaint asserts claims for fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, intentional infliction of emotional distress, gross negligence, defamation, violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and violations of New York's General Business Law, N.Y. Gen. Bus. Law § 349.  Now before the Court is plaintiff's application for a preliminary injunction seeking various forms of relief relating to his status as a student at Tetr.[1]

---

[1] See Plaintiff's Superseding Memorandum of Law in Support, filed Dec. 23, 2025 (Docket # 99) ("Mem."); Proposed Order, annexed as Ex. 1 to Mem. (Docket # 99-1) ("Proposed Relief"); Declaration of Ege Kilinc in Support, filed Dec. 23, 2025 (Docket # 98) ("Kilinc Decl."); Defendants' Superseding Memorandum of Law in Opposition, filed Jan. 14, 2026 (Docket # 109) ("Opp."); Declaration of Tarun Gangwar in Opposition, filed Jan. 14, 2026 (Docket # 110);

For the reasons set forth below, plaintiff's application for a preliminary injunction should be denied.

I.      BACKGROUND

        A.  Procedural History

At the time he filed the complaint, plaintiff sought a temporary restraining order, which was denied.  See Order, dated Sept. 29, 2025 (Docket # 15).  Because plaintiff is proceeding pro se, the Court construed his application for a temporary restraining order as also seeking a preliminary injunction, and thus ordered defendants to show cause why a preliminary injunction should not issue.  See Order, dated Sept. 29, 2025 (Docket # 17).  After briefing on this Order to Show Cause was complete, but before the Court could rule on it, plaintiff wrote to the Court seeking to "narrow the relief sought."  Letter from Ege Kilinc, dated Dec. 3, 2025 (Docket # 88).  Accordingly, the Court ordered re-briefing of plaintiff's application for a preliminary injunction. See Order, dated Dec. 3, 2025 (Docket # 89).  Re-briefing has been completed.

        B.  Facts Relevant to the Instant Application

Plaintiff's complaint and many subsequent filings (which total many hundreds of pages) present a multitude of facts that are irrelevant to his request for injunctive relief.  The Court relates plaintiff's factual contentions herein only to the extent necessary to rule on the instant application.  Except as otherwise noted, these facts are either undisputed or taken in the light most favorable to plaintiff.  While the Court sometimes cites to factual contentions in plaintiff's unsworn statements, including the complaint, such citations do not prejudice defendants, given our conclusion that plaintiff is not entitled to injunctive relief.

---

Plaintiff's Superseding Memorandum of Law in Further Support, filed Jan. 21, 2026 (Docket # 114) ("Reply"); Declaration of Ege Kilinc in Further Support, filed Jan. 21, 2026 (Docket # 113).

2

Plaintiff alleges that he is a United States citizen and a student at Tetr, an international college organized under the laws of India that "claim[s] to be operating out of" a New York, New York address. See Complaint, filed Sept. 24, 2025 (Docket # 1) ("Compl."), ¶¶ 10-11. Tetr "operates across eight different countries, with students and staff moving locations every few months." Id. ¶ 20. In August 2024, plaintiff and Tetr entered into a contract as part of his enrollment. See Contract, annexed as Ex. I to Declaration of Tarun Gangwar, filed Oct. 17, 2025 (Docket # 38-1) ("Contract"). Plaintiff "completed his first term in Dubai from September through December 2024 and his second term in the Haryana province of India from January through April 2025." Declaration of Tarun Gangwar, filed Oct. 17, 2025 (Docket # 38) ("Gangwar Decl."), ¶ 7. He was set to begin his third term in Singapore in August 2025. See id. ¶¶ 7, 16.

Plaintiff alleges that an individual the Court refers to as "S.K.," a fellow student at Tetr whom plaintiff identifies as his "ex-girlfriend," fraudulently obtained a restraining order against him from a court in Turkey in July 2025. See Compl. ¶ 31; Restraining Order, annexed as Ex. 4 to Compl. (Docket # 1-2).

For their part, defendants state that on July 16, 2025, Tetr learned from S.K.'s mother that plaintiff had sent threatening messages to S.K. See Declaration of Jessica Varghese, dated Oct. 17, 2025 (Docket # 37) ("Varghese Decl."), ¶ 4. S.K.'s mother shared these messages with Tetr. See id. ¶ 5.[2] On July 22, 2025, S.K.'s mother again contacted Tetr to state she had obtained a

---

[2] Plaintiff's messages were in Turkish. Jessica Varghese, Tetr's Director of Student Experience, used a machine translation tool to translate them. See Varghese Decl. ¶ 5. Using this tool, Varghese determined that plaintiff threatened S.K. and her mother. Id. Plaintiff submits a sworn statement from a professional translator giving his professional opinion that the messages "contain[ed] no credible threats to life." Declaration of Suha Gunay, filed Dec. 23, 2025 (Docket # 100). The Court need not resolve any factual dispute over the content of plaintiff's messages to decide the instant application.

restraining order against plaintiff from a court in Turkey.  Id. ¶ 8.  She purported to provide the

original and a translation of the order.  Id.  According to a translation of the order attached to the

complaint, it required plaintiff "to refrain from words and acts involving threats of violence,

insults, humiliation, or degrading treatment directed at the victim [S.K.] of violence, and not to

approach [her] residence, school, or workplace" for two months.  Restraining Order at *20.[3]

Tetr discussed the restraining order with plaintiff, informing him that any contact with

S.K. was prohibited under the order.  Varghese Decl. ¶ 9.  On July 31, 2025, plaintiff sent Tetr a

lengthy email disputing the order's contents and validity.  Email from Ege Kilinc, dated July 31,

2025, annexed as Ex. 15 to Compl. (Docket # 1-2).[4]  In the ensuing weeks, plaintiff sent Tetr

further emails, threatening legal action, asserting that the school had not taken appropriate

measures against S.K., and disclosing his own physical and mental health challenges.  See, e.g.,

Email from Ege Kilinc, dated Aug. 11, 2025, annexed as Ex. 17 to Compl. (Docket # 1-2); Email

from Ege Kilinc, dated Aug. 13, 2025, annexed as Ex. 18 to Compl. (Docket # 1-2), at *72-*75;

Email from Ege Kilinc, dated Aug. 15, 2025, annexed as Ex. 18 to Compl. (Docket # 1-2), at

*77-*78; Email from Ege Kilinc, dated Aug. 16, 2025, annexed as Ex. 18 to Compl. (Docket # 1-

2), at *79-*81; Email from Ege Kilinc, dated Aug. 18, 2025, annexed as Ex. 18 to Compl.

(Docket # 1-2), at *81-*82; Email from Ege Kilinc, dated Aug. 20, 2025, annexed as Ex. 24 to

Compl. (Docket # 1-2), at *100-*02; Email from Ege Kilinc, dated Aug. 21, 2025, annexed as

Ex. 24 to Compl. (Docket # 1-2), at *113-*15.  On August 25, 2025, plaintiff made certain

---

[3] *___ refers to the page number assigned by the ECF system.

[4] In briefing the instant application, plaintiff filed a document indicating that a Turkish court affirmed the validity of the restraining order on October 31, 2025.  See Plaintiff's Petition to the Constitutional Court of the Republic of Turkey, annexed as Ex. W to Kilinc Decl., at *400-01.

demands of Tetr relating to his being kept separated from S.K. once the semester started, and threatened to file a federal lawsuit if those demands were not met. See Email from Ege Kilinc, dated Aug. 25, 2025, annexed as Ex. 24 to Compl. (Docket # 1-2), at *127-*28.

On August 27, 2025, while still in the United States, plaintiff spoke with representatives from Tetr about his return to school for the fall 2025 term in Singapore. See Compl. ¶ 37. Plaintiff alleges that Tetr's Program Director, Tarun Gangwar, "made enforceable promises of strong action and a safe educational environment" during the call. Id. In reliance on Gangwar's promises, plaintiff flew to Singapore to resume his education. See id.

According to a transcript of the call provided by plaintiff, plaintiff told Gangwar, "I want to be on the flight that's gonna depart . . . [in] 11 hours." Aug. 27, 2025 Transcript, annexed to Supplemental Declaration of Ege Kilinc, filed Oct. 24, 2025 (Docket # 46), at *194:20-21. Gangwar responded:

> I think we understand the urgency, uh, that you feel to — to come to Singapore. Um, I think . . . that it still requires to have, A, one, an internal conversation, and B, like you said, a conversation with the student [i.e., S.K.], herself, um, right? . . . Um, what I can assure you is that, obviously, some action will be taken in the next 12 hours. What I can't assure you is that — what would be the outcome of that action . . . .

Id. at *194:22-*195:2-8. Gangwar suggested that plaintiff "wait for at least a day" before booking his ticket to Singapore. Id. at *214:15. Gangwar continued:

> Wait one day before you book your ticket . . . before you plan your travel. But then, what I will assure you, that, in 24 hours, you will hear back from the team [i.e., Tetr], right, um, to that effect. . . . [M]aybe give them 24 hours. I think that's a fair ask from their end, as well.

Id. at *214:25-*215:6. In response, plaintiff stated, "I think that's fair." Id. at *215:7. He then stated, "I'll just book my ticket right now and be on my way. And like I said, I trust you. If it

doesn't work out, for some reason, I'll just, uh, book another flight and come back to here [i.e., the United States]." Id. at *215:10-13.

Plaintiff alleges he flew to Singapore "within hours" of the August 27, 2025 call. Compl. ¶ 37. While plaintiff was en route to Singapore, Tetr sent him an email outlining a protocol to keep him and S.K. separate. As detailed in Tetr's email, this protocol consisted of:

- Separate Academic Sections: [S.K.] and you have been placed in different academic sections. This ensures that there will be no overlap in your classes, group work, or academic activities.
- Gender-Segregated Residential Facilities: Our student housing remains strictly gender segregated. Your accommodation has been reserved for you in the student hostel and there should be no overlap as the institutional residential arrangements already guarantee gender segregation. As we understand, this should suffice and does not warrant a separate hotel or safehouse.
- No-Contact Directive: Both parties have been instructed to restrict any form of contact with each other — direct or indirect, through peers, group settings, social media or social gatherings — for your own well being and safety.
- Designated Single Point of Contact (SPOC): You have been assigned a dedicated staff member as a point of contact. This ensures that any concern can be escalated directly, promptly, and confidentially, and that you have structured institutional support at all times.
- Staff Oversight at Shared Events: For any public engagements involving the wider student body, a designated staff member will be present to monitor and ensure that no interaction takes place between [S.K.] and you.

Email from Student Compliance Team, dated Aug. 29, 2025, annexed as Ex. 26 to Compl. (Docket # 1-2), at *139-*140.

Plaintiff alleges that this email "walk[ed] back" Tetr's "promises and assurances from the previous day's meeting, replacing all the promised safety measures" with a protocol he considered "inadequate." Compl. ¶ 38. At the time, plaintiff told Tetr the protocol was "INSULTING" and accused it of bad faith. Email from Ege Kilinc, dated Aug. 29, 2025, annexed as Ex. 26 to Compl. (Docket # 1-2), at *141. He detailed a number of problems he had with the protocol, including that "gender segregation" would not prevent him "from being photographed" by S.K. Id. He also stated that he could not attend school safely because

6

"[a]nother student [i.e., S.K.] threatened my legal liberty using fraudulent court documents." Id. He concluded with the following ultimatum to Tetr: "You have 3 hours and 40 minutes left to book me a safehouse away from that student till you immediately resolve this or I'm immediately going to take legal action[,] and my mother will make sure that your institutional cruelty is on the front page." Id.

Upon arriving in Singapore, plaintiff refused to attend classes or stay at the accommodation arranged by Tetr, claiming it was unsafe for him to do. See Compl. ¶ 4. Plaintiff had several meetings with representatives from Tetr after his arrival, however. See Gangwar Decl. ¶¶ 24, 27; Declaration of Ayush Jain, filed Oct. 17, 2025 (Docket # 39), ¶¶ 8, 10. On September 3 and 5, 2025, plaintiff met with Gangwar, which resulted in a new, temporary protocol, memorialized in an email from Tetr on September 5. See Email from Student Compliance Team, dated Sept. 5, 2025, annexed as Ex. 41 to Compl. (Docket # 1-2) ("Sept. 5, 2025 Email"). Plaintiff views this protocol as reneging on "agreed-upon safety measures," Pl. Mem. at 17, and suggests that this came about as retaliation for plaintiff's contacting Tetr's "founder," Pratham Mittal, id. Plaintiff attaches a transcript of a recording of the September 5 meeting; Gangwar is quoted as saying, "I spent the last whole day trying to get what you had asked me to[.] . . . I think I would have succeed, uh, if you had not involved Mr. Pratham." Sept. 5, 2025 Transcript, annexed as Ex. T to Kilinc Decl., at *113:5-6, *114:3:4.

The new protocol consisted of the following:

1. A dedicated SPOC will be assigned to you until 21st September, 2025.
2. A dedicated SPOC will also be assigned to [S.K.]. until 21st September, 2025.
3. You and [S.K.] will continue to remain in separate academic sections throughout the term.
4. You will not be placed in the same assignment groups at any point during this term.
5. You will remain in gender-segregated accommodation during your term in Singapore.

6.  You and [S.K.] will travel in separate vehicles (including buses) for academic activities.
7.  As an additional courtesy, and only upon your special request to Mr. Gangwar, Tetr has agreed to provide a total budget of up to SGD 2,000 to facilitate your alternative accommodation for the next 15 days, ending 21st September, 2025.

Sept. 5, 2025 Email.  Tetr's September 5 email to plaintiff concluded:

We will also be sharing a detailed schedule with you, including suggested entry and exit timings recommended by us to minimize the possibility of any personal interaction between [S.K.] and you, before Monday. While Tetr is extending these measures as a courtesy, please note that Tetr does not and cannot guarantee that no interaction will occur between you and [S.K.]. These are best-effort steps taken in good faith with the intent of minimizing personal interaction, but incidental encounters remain possible.

Id.

Plaintiff took exception to these last lines, and particularly to Tetr's inability to guarantee that there would be no interaction between S.K. and himself.  See Messages from Ege Kilinc, dated Sept. 5, 2025, annexed as Ex. 42 to Compl. (Docket # 1-2), at *185.  Plaintiff stated that for his "safety," he would not attend classes until S.K. was suspended.  Sept. 5, 2025 Transcript at *165:24; see also Messages from Ege Kilinc, at *188 (seeking a "guarantee of enforcement" vis-à-vis S.K.).

It appears that plaintiff did not attend classes for the duration of the fall 2025 term in Singapore.  As plaintiff puts it, Tetr's "failure to mitigate a known, foreseeable risk left Plaintiff with no option but to self-isolate in a hotel room."  Mem. at 18.  At some point in October 2025, plaintiff was staying in Indonesia.  See Supplemental Declaration of Ege Kilinc, filed Oct. 17, 2025 (Docket # 32), ¶ 19.  Later, plaintiff moved to Malaysia.  See Kilinc Decl. ¶ 33.

While not relevant to our ruling, we note that plaintiff complains about several other actions allegedly taken by Tetr, including instructing him to enter Singapore on a tourist visa,

8

dispatching police to his hotel room in Singapore under the guise of a wellness check, and ignoring his attempts at outreach.  See Mem. at 19-20.

In November 2025, plaintiff attempted to make arrangements for Tetr's spring 2026 term in Ghana.  Kilinc Decl. ¶ 33.  Plaintiff received the following response from defendants' counsel:

> As for joining the upcoming term in Ghana, your request is surprising given that your prior communications and actions have indicated to the school that you are withdrawing from Tetr and not planning to attend in Ghana.  Indeed, the school sent numerous reminders to you in August concerning your travel plans for Ghana and did not receive any response by the deadline of August 14, 2025 and thus has not secured travel plans for you.  Moreover, you left the Singapore term voluntarily and have never indicated that you are prepared to attend classes. . . . Please also note that the school has no record of receiving your payment for the Ghana term.  If you have a record of payment, please send it to me.
>
> Notwithstanding the above, you will not be able to participate in the Ghana term in 2026. . . .  [Y]ou have missed an entire semester of coursework, have incurred an excessive number of absences, and received incomplete grades.  Each of these infractions alone permits the school to suspend or terminate you as a student and/or revoke your scholarship pursuant to the terms of the Student Handbook.  At this time, the school is selecting not to terminate your enrollment or revoke your academic scholarship.  However . . . you will need to retake the Singapore term in 2026 before being permitted to attend the Ghana term.  The school is willing to revisit your ability to re-enroll in the Singapore term for the fall of 2026.  If you have in fact paid for the Ghana term already, the school will be providing you a refund.

Email from Brett Van Benthysen, dated Nov. 27, 2025, annexed as Ex. V to Kilinc Decl. (Docket # 98) ("Email from Counsel"), at *386.  Plaintiff asserts that his prolonged absence from school was the result of defendants' failure to provide him with "safety accommodations" or "allow entry to the classroom."  Mem. at 21.  Plaintiff cites to no record evidence, however, demonstrating that Tetr denied him access to classes.[5]

---

[5] The complaint attaches a September 7, 2025 email from plaintiff's "SPOC" arranging "online access" to certain school events "from a designated classroom."  Email from Ayush Jain, dated Sept. 7, 2025, annexed as Ex. 43 to Compl. (Docket # 1-2).

Plaintiff seeks a preliminary injunction that would restrain defendants from: "[a]ltering" his status "as a full-time enrolled student in good standing"; "interfering with" his access to defendants' facilities or activities; "[w]ithholding academic materials, lecture recordings, examination links, or visa support documents"; "relying upon . . . any absences accrued during the period of Plaintiff's constructive exclusion (from August 25, 2025 to the date of this Order) as a basis for academic suspension, expulsion, or denial of participation in any academic term"; "[m]arking Plaintiff as 'absent' or penalizing Plaintiff for non-attendance until such time as Defendants have restored Plaintiff's safe, physical access to the classroom"; "[d]enying Plaintiff the opportunity to cure academic deficiencies, submit late assignments, or sit for missed examinations"; and "[r]escinding or modifying the safety protocols established in Defendants' September 5, 2025 correspondence, or failing to enforce said measures."  Proposed Relief ¶¶ 1-7.

## II.    LEGAL STANDARDS

A preliminary injunction is "an extraordinary remedy" which requires "a clear showing that the plaintiff is entitled to such relief."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) (citation omitted).  To obtain this relief, the plaintiff "must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest."  State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Practice P.C., 120

---

On October 17, 2025, plaintiff informed the Court that defendants were "purposefully withholding" his visa to Malaysia, where Tetr was allegedly relocating for the remainder of the fall term.  Supplemental Declaration of Ege Kilinc, filed Oct. 17, 2025 (Docket # 32), ¶ 27.  However, on October 24, 2025, plaintiff stated that he was in Malaysia, "approximately 15 minutes away from the Campus."  Supplemental Declaration of Ege Kilinc, filed Oct. 24, 2025 (Docket # 46), ¶ 68.

F.4th 59, 79 (2d Cir. 2024) (quoting N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc., 883 F.3d 32, 37 (2d Cir. 2018)).

"Courts refer to preliminary injunctions as prohibitory or mandatory": the former "maintain the status quo pending resolution of the case"; the latter "alter it." N. Am. Soccer League, LLC, 883 F.3d at 36 (citation and footnote omitted). In this context, the "status quo" refers to the "last actual, peaceable uncontested status which preceded the pending controversy." Id. at 37 (quoting Mastrio v. Sebelius, 768 F.3d 116, 120 (2d Cir. 2014)). Because they alter the status quo, mandatory injunctions are held to a "heightened legal standard" under which the plaintiff must show "a clear or substantial likelihood of success on the merits." Id. (citation and internal quotation marks omitted). Here, the parties dispute whether plaintiff's proposed preliminary injunction is prohibitory or mandatory. While we think it likely to be mandatory, we need not resolve this question inasmuch as plaintiff cannot prevail even if the requested injunction is characterized as prohibitory.

"The irreparable harm requirement is 'the single most important prerequisite for the issuance of a preliminary injunction'," and it must be "satisfied before the other requirements for an injunction can be considered." State Farm, 120 F.4th at 80 (quoting Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009)). To satisfy the irreparable harm requirement, a party must demonstrate "a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." Id. (quoting Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002)). The harm must be "neither remote nor speculative, but actual and imminent." Id. (quoting Faiveley, 559 F.3d at 118).

11

In ruling on a motion for a preliminary injunction, "[a]n evidentiary hearing is not required when the relevant facts either are not in dispute . . . or when the disputed facts are amenable to complete resolution on a paper record." Charette v. Town of Oyster Bay, 159 F.3d 749, 755 (2d Cir. 1998) (citations omitted).  Here, the Court's ruling relies on undisputed facts, facts taken in the light most favorable to plaintiff, or factual findings that can be made based on the paper record.

III.    DISCUSSION

Defendants assert that a forum selection clause in plaintiff's student contract bars this suit altogether.  See Opp. at 14-16.  The Court views this assertion as subsumed within defendants' argument that plaintiff is unlikely to succeed on the merits.  See Textor v. Iconic Sports Eagle Inv. LLC, 2025 WL 2840745, at *3 (S.D. Fla. July 28, 2025) ("As part of the injunctive-relief evaluation, courts may consider a nonmovant's asserted defenses in weighing the movant's likelihood of success on the merits.") (citations omitted).  Because, as described below, plaintiff is unable to show irreparable harm, we do not reach defendants' argument that plaintiff is unlikely to succeed on the merits.

Instead, the Court finds that plaintiff has not shown irreparable harm for two independent reasons: (1) he has not shown that any claimed harm cannot be compensated by monetary damages, and (2) the harm he identifies is self-inflicted.

A.  Monetary Damages Will Compensate Plaintiff

Plaintiff claims he faces irreparable harm in that he has been "constructively suspended" from Tetr.  See Mem. at 21; accord id. at 35.  However, he has not shown why monetary damages will not compensate him for this harm.

To the extent plaintiff seeks to obtain a university education, he provides no evidence that would allow the Court to find that his current entanglement with Tetr prevents him from doing so.  See generally Phillips v. Marsh, 687 F.2d 620, 624 (2d Cir. 1982) (Winter, J., concurring) ("There are no lack of colleges or universities which [plaintiff] might attend if all that is at stake is loss of instruction time.").  Plaintiff asserts that "Defendants have created a toxic transcript that effectively blacklists Plaintiff from transferring."  Reply at 11.  This is unsupported speculation, however, and does not suffice to show that he cannot enroll at another institution beginning this summer or fall.  See Doe v. Princeton Univ., 2020 WL 2097991, at *7 (D.N.J. May 1, 2020) ("[T]he argument that Plaintiff's reputation, ability to enroll at other institutions, and ability to pursue a career would be damaged is too speculative to satisfy the irreparable harm requirement."); Caiola v. Saddlemire, 2013 WL 1310002, at *2 (D. Conn. Mar. 27, 2013) ("[Plaintiff] argues that the stigma of his expulsion will interfere with his academic and teaching career.  Such interference is speculative.").

To the extent plaintiff is arguing that waiting for an award of monetary damages will cause irreparable harm by delaying his university education, case law holds that "the harms a plaintiff might suffer from a delay in graduation are quantifiable and can be adequately remedied by money damages, should the plaintiff prevail on the merits of his case."  Doe v. Vassar College, 2019 WL 6222918, at *6 (S.D.N.Y. Nov. 21, 2019) (citing Phillips, 687 F.2d at 622).

Plaintiff may be asserting that "an interruption in coursework is irreparable harm," id., but with regard to a university education, "courts have not found irreparable harm when a suspended student is unable to identify specific career prospects or educational plans that would be forfeited by serving a suspension," Rignol v. Yale Univ., 2025 WL 1295604, at *10 (D. Conn. May 5, 2025) (collecting cases); see Doe v. Siena Coll., 2023 WL 197461, at *12 (N.D.N.Y. Jan.

13

17, 2023) (noting that courts have not found irreparable harm in similar situations "because any harm to employment or reputation stemming from a gap in studies was too 'speculative'"). Thus, to the extent plaintiff complains of Tetr having "constructively suspended" him, plaintiff has not identified specific career prospects or educational plans that would be imperiled if he does not immediately attend Tetr.

The cases plaintiff cites to support his position are not to the contrary. In Goss v. Lopez, 419 U.S. 565 (1975), the Supreme Court ruled that public secondary school students could not be suspended without notice and an opportunity to be heard under the Due Process Clause. See id. at 577. Here, Tetr is a private actor and is not required to afford plaintiff due process. Moreover, Goss's language about suspension being a "serious event" applied to children at public secondary schools, not to adults at private universities. In any event, Goss says nothing about whether a suspension constitutes irreparable harm.

Similarly, D.D. ex rel. V.D. v. New York City Bd. of Educ., 465 F.3d 503 (2d Cir. 2006); N.D. v. Reykdal, 102 F.4th 982 (9th Cir. 2024); and Cosgrove v. Bd. of Educ. of Niskayuna Cent. Sch. Dist., 175 F. Supp. 2d 375 (N.D.N.Y. 2001), involved the schooling of disabled children or young adults who were deprived of "mandated educational services" to which they had a legal entitlement. D.D., 465 F.3d at 510; see N.D., 102 F.4th at 987, 994-95; Cosgrove, 175 F. Supp. 2d at 392-93. These cases are thus irrelevant.

In sum, plaintiff has not shown irreparable harm. Because a "finding of no showing of irreparable harm is dispositive," Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 68 (2d Cir. 2007), plaintiff is not entitled to preliminary injunctive relief.

B.  Self-Inflicted Harm

It is settled that a plaintiff cannot meet the irreparable harm requirement by "manufactur[ing] [his] own exigency."  Convergen Energy WI, LLC v. L'Anse Warden Electric Co., LLC, 2020 WL 5894079, at *5 (S.D.N.Y. Oct. 5, 2020).  Thus, "[i]f the harm complained of is self-inflicted, it does not qualify as irreparable."  Id. (quoting Caplan v. Fellheimer Eichen Braverman & Kaskey, 68 F.3d 828, 839 (3d Cir. 1995)) (alteration in original); see Howe v. Burwell, 2015 WL 4479757, at *6 (D. Vt. July 21, 2015) (party seeking a preliminary injunction must "establish that his alleged harm is not self-inflicted") (citations omitted); 11A Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) ("Not surprisingly, a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted.").

The record reflects that plaintiff's "constructive suspension" is the result of his own actions.  Notwithstanding plaintiff's assertion in his brief that Tetr failed to provide him with "safety accommodations" and did not "allow entry to the classroom," Mem. at 21, he has provided no evidence that Tetr actually failed in these areas.  Instead, the record reflects that plaintiff opted not to attend classes following his September 5, 2025 meeting with Gangwar based on his dissatisfaction with Tetr's protocol and lack of faith in Tetr's ability to enforce it.  Given that the protocol offered was a reasonable one (based on the information available to Tetr), plaintiff has only himself to blame for the failure to attend classes.

Plaintiff asserts that he stopped attending classes because Tetr unilaterally "revoked" the protocol, but he offers no evidence of Tetr's revocation.  Id. at 4.  He insists that he "accepted" the protocol and only "refused" Tetr's "premature" decision to "lift" it.  Reply at 16.  But, again, he offers no evidence that defendants lifted the protocol implemented on September 5.  Instead, he refers to Tetr's refusal to "guarantee" that he would have no interaction with S.K.  Mem. at

15

17. Plaintiff characterizes Tetr's refusal as a "disclaimer of responsibility." Id. By contrast, we view Tetr's refusal as a recognition of reality. Tetr, a private actor, had no power to prevent S.K. (or plaintiff) from breaching the September 5 protocol. Tetr was not responsible for the existence of what was presented to them as a valid restraining order. Tetr acted reasonably by setting up a protocol to minimize the possibility of contact between plaintiff and S.K. It could not reasonably be expected to act as a guarantor of non-contact.

Plaintiff also highlights that Tetr "suggested," but did not require, separate "entry and exit timings" for him and S.K. Id. at 18. We accept as reasonable Gangwar's contemporaneous explanation of this language: "[I]t's obviously your responsibility to make sure you follow those timings[.] How can someone else take responsibility that you follow the timings . . . [?] Hence the word [']suggestion['][.]" Message from Tarun Gangwar, dated Sept. 5, 2025, annexed as Ex. 42 to Compl. (Docket # 1-2), at *185.

In plaintiff's student contract, he agreed "to attend all classes and to comply with all academic policies of Tetr and the Partner Institutions, including but not limited to attendance and engagement requirements." Contract ¶ 6(b). Plaintiff chose not to attend classes, thus violating his agreement as a Tetr student. As a result, the Court views it as reasonable that Tetr would require plaintiff to "retake the Singapore term in 2026 before being permitted to attend the Ghana term." Email from Counsel. The harm plaintiff identifies — what he calls a "constructive suspension," Mem. at 35— is thus "no more than the consequence of his own choice," Lawrence v. Wilder Richman Sec. Corp., 359 F. Supp. 2d 161, 166 (D. Conn. 2005), and cannot satisfy a showing of irreparable harm.

Conclusion

Plaintiff's motion for a preliminary injunction (see Docket # 17) should be denied.

16

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections. See also Fed. R. Civ. P. 6(a), 6(b), 6(d). A party may respond to any objections within 14 days after being served. Any objections and responses shall be filed with the Clerk of the Court. Any request for an extension of time to file objections or responses must be directed to Judge Torres. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 6(d), 72; Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: March 4, 2026
      New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

17